# ROCKINGHAM,

## DECEMBER TERM, A. D. 1854.

## ATLANTIC MUT. FIRE INS. CO. *v.* GOODALL.

A policy, numbered 50, was issued to the defendant in Class No. 4, of an insur-
ance company, but no policy had been issued in that class bearing a lower
number. *Held*, that this numbering was not a fraud upon the defendant, as
inducing him to believe that there were forty-nine persons who would share
the losses with him, as the numbering seemed to have been entirely arbitrary.

The charter of an insurance company provided that a policy should be void if
there were an insurance in any other company, unless the assent of the direc-
tors to the double insurance should be indorsed upon the policy. The defend-
ant applied for an insurance on the 13th of January, 1849, at which time his
property was insured in the N. H. Mutual Co., but this policy he surrendered
on the 1st of February, after receiving a policy from the plaintiffs. No in-
dorsement was made upon the policy, in compliance with the charter. In an
action to recover the assessments upon the defendant's premium note, he
contended that the policy was void because the consent of the directors was
not indorsed upon the policy. The evidence tended to show that the policy
was not to take effect, by the understanding and agreement of the parties,
until the policy in the N. H Mutual Co. should be surrendered, and that nei-
ther party ever contemplated a double insurance. *Held*, that under these cir-
cumstances the policy was valid, and that the defendant was liable to pay the
assessments on the note.

ASSUMPSIT, upon a note, of which the following is a
copy :

" Fourth Class. For value received in policy No. 564,
dated the 22d day of January, 1849, issued by the Atlantic
Mutual Fire Insurance Company, I promise to pay said
company, or their treasurer for the time being, the sum of
one hundred and eighty dollars, in such portions, and at

such time or times as the directors of said company may, agreeably to their act of incorporation and by-laws, require.

IRA GOODALL, Principal."

The policy for which the note was given is dated January 22, 1849. The application for the same is numbered 564, and dated January 13, 1849. An assessment of $18 upon this note was made February 4, 1850, and notified to the defendant, but he refused to pay it, upon the ground than then there was no valid and subsisting contract between him and the company, as will appear from the letters dated March 5, 1849, March 7, 1849, May 15, 1850, December 17, 1850, and December 19, 1850. At the trial it appeared that the first policy issued in class four of the company was numbered 50, and that no policy had been issued in that class bearing a lower number, and the defendant contended that the false numbering was a fraud upon him, and avoided the contract if otherwise operative. It was proved that at the date of the defendant's application, and policy, the same property mentioned therein was insured in the N. H. Mutual Co., but he surrendered his policy in the N. H. Mutual, February 1, 1849, after receiving the policy now in dispute. Samuel H. Goodall testified that when Mr. Gale called upon his father, the defendant, to obtain application for insurance, his father informed him that he was already insured in the N. H. Mutual, and that he did not wish to be at any time without an insurance; and Mr. Gale replied that it was the custom of his company for the applicant to keep his old policy until the new one was received, and that the defendant might do so, and he would "fix it so that it would be all right and safe for him." He also testified that as near as he could remember, the policy in question came in the due course of mail directly after its execution, and his father wrote to have the other discharged "within a day or two or such a matter" afterwards, and that the company was written to upon the subject of the 16th section as soon

as his father's attention was called to it; according to his impression not more than two or three weeks after the policy was received, but he was not confident as to the time.

The 16th section of the charter provides " that if insurance on any house or building or other property shall be and subsist in said company and in any other company, or from or by any other person or persons, at the same time, the insurance made in and by this company shall be deemed and become void, unless such double insurance subsist with the consent of the directors, signified by indorsement on the back of the policy, signed by the president and secretary."

In Mr. Goodall's letter of March 5th, he wrote the company that he told their agent that he was insured in the New Hampshire Mutual; that he wished to surrender his policy there, and take out a policy with the plaintiffs; that the agent took the application and agreed to inform the plaintiffs and have it made all right. He then adds, " and he told me I might surrender them after I got yours. I see by your 16th section that your policy is void if you do not consent to it, on the back of the policy."

The secretary, on the 7th of March, wrote the defendant that he misapprehended the import of the 16th section, and says, " If you wish the insurance to remain in the New Hampshire Mutual Insurance Company, notwithstanding your insurance in our company, then it would be proper for the indorsement to be made, agreeably to the charter, but if you have no insurance in the New Hampshire Mutual Insurance Company, there is not the least necessity for the indorsement. I presume you have surrendered your policy. If that is the case, you may rest assured that your policies, Nos. 1022, 562, and 564, are good as they are, and that no indorsement is necessary."

In his letter of May 15th, the secretary wrote, " I understand by Mr. Gale, our agent, and by your letter of the 5th of March, 1849, that your policies were to be given up in the New Hampshire Mutual when you received policies

from our office. If such is the fact, why should you wish an indorsement, permitting double insurance to subsist where none did subsist, as you would be discharged from the New Hampshire Mutual when your insurance took effect in the company?" He also states that they had received applications for insurance " to be discharged from other offices when they took effect in ours," and says, " you can go into any other office and hold on to our policies until you receive policies from another office, and then request your policies in our office to be discharged at the time they take effect elsewhere."

In Mr. Goodall's letter to Mr. Dearborn, the treasurer, dated on the 17th of December, he says, " I have written you before that Gale, as your agent, came and I told him the property was insured in the New Hampshire and the New England Fire Insurance Companies, and was told by him to keep those on until I received your policies, and he would see it was all made right. After I got your policies I found that they were void by the 16th section of your charter, unless you signed your consent on the back of the policy to the former ones subsisting, &c. I then retained them to be surrendered unless you would make them good by signing your consent. This you refused."

Mr. Dearborn, in his letter of December 19th, says that the 16th section was designed to apply to cases where insurances were to subsist in his own, and also in some other company, and was not intended to apply to any case where no insurance was to be effected, except by his company. He also writes as follows: " I have examined the former correspondence between yourself and the secretary of this company, and I find that when you made application to be insured at this office, you had insurance on the same property in the Concord companies, and that it was your intention at that time to give up your policies in the Concord offices when our policies should take effect in this office. This was the understanding that Mr. Gale, the individual

who made out your application, has relative to this subject, and the secretary and directors of this office supposed, when they issued your policies, that the policies covering the same property which you held from the Concord companies, were to be discharged, and that only one insurance was to subsist on your property, and that in this office. This being the fact, section 16th of our charter did not invalidate your policies, nor was any action on the part of the officers of this company necessary for your security."

A verdict for the amount of the note was taken by consent, upon which judgment was to be rendered, or it was to be set aside and judgment rendered for the defendant, or a new trial had, as this court might order.

*S. H. Goodall,* for the defendant.

From the evidence in this case, and also from the admission of the plaintiffs themselves, in the letter of the 15th of May, 1850, it distinctly appears that Ezra Gale was the plaintiff's agent, and that policies in the New Hampshire Mutual were not to be surrendered by the defendant until the reception of the plaintiffs' policies by the defendant, from the plaintiffs, and that this was brought home to the knowledge of the plaintiffs by their agent, and was understood and agreed to.

The plaintiffs do not contend, in any of their letters, that they had no such knowledge, but they put it entirely upon the ground that it was not necessary for them to sign on the back of the policy in such a case as this; that this was not a case within their charter, requiring such indorsement.

The defendant takes these positions:

1. That when a corporation derive all their powers from a charter, they can act only under and in the way the charter prescribes.

2. That when the charter says a certain act is to be done in a certain way, and that the act shall be void unless

it is so done, that the charter means just what it says, and that the act not done in the way prescribed is void.

3. That the directors, as well as the president and secretary, are men under authority, and can give away the rights of the members only by the authority given them.

4. That neither the directors, president and secretary of the plaintiffs' company, nor the defendant, nor any of them, had any power to waive or alter any requirement of the charter.

In applying these principles to the 16th section of the plaintiffs' charter, the following questions arise:

I. Whether there was any other insurance on this property, being or subsisting in any other company at the same time this one has purported to subsist in the plaintiffs' company?

II. If there were such other policy, has there been such consent of the plaintiffs' company as is required by the plaintiffs' charter to make the policy good in the plaintiffs' company?

1st. Was there any other policy subsisting at the same time as this one?

It appears that the plaintiffs' policy is dated January 22, 1849, and that the policy in the New Hampshire Mutual was surrendered February 1, 1849.

Then there were two policies subsisting at the same time in full force and virtue, (if the plaintiffs' policy were not void,) for the space of nine days. Nothing had been done to render the New Hampshire Mutual Co.'s policy void before February 1.

We say, then, that the policy of the New Hampshire Mutual remained good, and was subsisting at the same time as the plaintiffs' policy purported to have been, and that the plaintiffs' policy was void by the terms of the charter itself, unless consent was given as required.

The issuing of a void policy from the plaintiffs' company did not make void the policy in the New Hampshire Mu-

tual, and when one of the two policies must be void in such a case as this, the last one issued is void and the first one good. *Clark* v. *New England Fire Ins. Co.*, 6 Cush. 342.

The New Hampshire Mutual would have been liable to any loss up to the time of the surrender, on the first day of February. Then one of two results must follow; either the plaintiffs' policy did not take effect until February 1, or else it was void by the terms of the charter.

There is no doubt that the plaintiffs' policy, if good for any time, was good from 12 o'clock at noon on the 22d day of January, and from this time to the termination of the policy. If so, then it was void by the terms of the charter.

There is no doubt that if the plaintiffs' president and secretary had signed a writing on the back of the policy, as the charter prescribes in such a case, that then the policy would have been good and valid in the plaintiffs' company, and perhaps the policy in the New Hampshire Mutual would have been void by the terms of its charter. Then there was a way by which the plaintiffs could legally have issued, in this case, a good and valid policy, as they agreed to do by their agent.

This brings us to the second question. Did the plaintiffs consent to the subsistence of the policy in the other company, so as to bind the plaintiffs? Plainly not.

It was necessary that the plaintiffs' consent should be in writing, on the back of the policy, and signed by the president and secretary; the charter required it. The letter of March 7, is not such consent. The plaintiffs have never to this day made a good and valid policy to the defendant. The consent has never been given, nor have the provisions of the charter been waived.

The defendant also takes this position. That the policy was surrendered by the defendant March 5, 1849, and all assessments paid up to that time, and that made the policy null and void by the terms of the plaintiffs' charter and by-laws, even if it were of any validity whatever before.

The assessment here sought to be recovered was one made in February, 1850, as appears by the case. The defendant paid all assessments up to the time of the surrender, as appears by his letter of December 17, 1850, and also from the fact that the plaintiffs claim only the assessment of February, 1850. The fact is, the policies were returned with the letter of March 5, 1849, and it is not shown nor is it pretended in this case that the defendant ever agreed to accept such a policy as this after the surrender, but exactly the reverse is proved from the whole tenor of the letters. Then the surrender makes the policy void.

As to the ground of fraud, the court will readily see that when a company is first starting, if a person knew, or supposed he knew that he had fifty besides himself to pay for losses in a mutual company, he might get insured, when if there was only one, he might decline. The same argument applies to 564 and 514. Although not certified by the judge in this case, the evidence given on trial showed that one ground taken by the plaintiffs' agent to persuade the defendant to get insurance was the number of policies issued, and in this view it is a direct fraud, and there could have been no reason but this for the plaintiffs commencing at fifty instead of one.

As to the 16th section, the legislature intended by the strictness of the statute to exclude all parol evidence of any consent to any other policy.

In case of a fire between January 22, 1849, and February 1, there can be no doubt but that the New Hampshire Mutual would have been liable, and the defendant, if he had been called upon under article 11th of the plaintiffs' by-laws to make his statement, would have had to state that there was a policy subsisting in the New Hampshire Mutual; then on examining the plaintiffs' policy, and not finding such indorsement and agreement on the back of the policy as the charter requires, the defendant could not have recovered. He could not have shown the parol agreement, because it

would have been contrary to the statute, and he could not have recovered of the plaintiffs, because he had not the policy with the indorsement on the back. The agent was not in fault, nor was the defendant. The plaintiffs are the only ones to blame.

There was a legal mode of carrying out the agreement with the plaintiffs, and they did not and would not adopt it. There was nothing wrong in the agreement between the defendant and the plaintiffs' agent, nor was there any fraud or concealment afterwards on the part of the defendant. He, as soon as he discovered the difficulty, immediately sent on to have it remedied, and requested to have his policies made good, so that in case of loss he might be able to recover on them. The plaintiffs declined. Again, on the 1st day of August, 1849, the defendant requested the plaintiffs to sign, and spoke of a decision on this very point, and again the plaintiffs refused.

Thus the defendant has taken all the means in his power to get good policies, in order to avoid a law suit in case of loss by fire, but the plaintiffs refusing to make him good and valid policies, he obtained insurance elsewhere. The very agreement made between the agent and the defendant, and the very agreement spoken of by the letter of May 15, 1850, presupposes the fact that policies were to remain and subsist in the New Hampshire Mutual until the reception of the plaintiffs' policy. He was to keep the same until the plaintiffs' policy was received, and then, and not till then, the policy in the New Hampshire Mutual was to be surrendered.

This very thing shows that they understood and agreed that it should so subsist. That being the case, how can they now say that it did not subsist, where it really did subsist by agreement, and was not cancelled, by agreement, until after reception of the plaintiffs' policy. The policy in the New Hampshire Mutual remained good until surrendered. No knowledge was brought home to them, nor any

agreement made by them, to surrender before February 1, nor by agreement between the plaintiffs' agent and the defendant was there to be any annulling or attempt to annul, until after the reception of the plaintiffs' policy.

The agreement necessary to be signed was a very simple matter. It would merely state the facts and agree that the policy might subsist in the New Hampshire Mutual until the reception of the plaintiffs' policy, and no longer. There is no doubt that a qualified consent could be given.

The plaintiffs took the ground in their letters, which I suppose will be the ground here, that immediately on the commencement of the policy in the plaintiffs' company, the insurance in the New Hampshire Mutual became void. That cannot be so. The defendant would have been liable in the New Hampshire Mutual to all his proportion of losses in that company, up to the time of the actual surrender, which he would not be if there had been no existing contract between him and the New Hampshire Mutual, and, in fact, the defendant has paid the New Hampshire Mutual all assessments up to February 1, 1849. There is no doubt but the defendant has had to pay assessments in two companies at the same time, from January 22 to February 1. There is no doubt but that the defendant's company were knowing to this, and had agreed to it, but did not in a legal way.

The plaintiffs must make a policy which is good, by the terms of their own charter, before they can render void a charter in another company.

The case in 23 Pick. 422 and 423, fully sustains this view. The defendant would then have been perfectly helpless, as far as the plaintiffs' company is concerned, in case of a loss between January 22 and February 1. Nothing short of an express agreement of each individual member to waive the charter would be binding. The directors could not agree to it. A majority of the stockholders could not. Nothing short of an express agreement of each member, individu-

ally, would answer, and then they would have been bound individually, and not as corporators. The fact is, the plaintiffs have attempted to make a legal policy in an illegal way and without the charter, to support the policy they had made. They could not waive the provisions of their charter without the defendant's permission; it must be mutual.

Here the defendant has expressly refused to waive it, and has insisted upon the consent being given in the way prescribed by the statute."

*Wells & Bacon,* for the plaintiffs.

GILCHRIST, C. J. This is an action of assumpsit upon a promissory note, for the sum of $180, for value received in policy No. 564, dated January 22, 1849, by which the defendant promises to pay the company this sum, " in such portions and at such time or times as the directors of said company may, agreeably to their act of incorporation and by-laws, require."

An assessment of $18 was made upon this note on the 4th of February, 1850, of which the defendant was notified; but he refused to pay it, upon the ground that there was no valid and subsisting contract between him and the company.

At the trial, it appeared that the first policy issued in class No. 4 of the company (to which this policy belonged) was No. 50, and that no policy had been issued in that class bearing a lower number, and the defendant contended that the false numbering was a fraud upon him and avoided the contract. The defendant's argument is that this numbering induced him to suppose that there were forty-nine more persons than there actually were, who would share all losses with him, and that if there were not that number of persons who had become insured, it would be holding out false colors to him. This consideration, however, appears to us to be altogether too remote to be regarded as evidence

of fraud. His application was numbered 564. The numbering may have been entirely arbitrary; and, for some reason best known to the company, and which we have no right to regard as indicating a fraudulent purpose, they chose to call their first policy No. 50. We do not consider this a sufficient reason for setting aside the verdict.

The important question in the case arises upon the evidence relating to the existence of two policies in different companies; and the defendant considers the question to be settled in his favor, by reason of the sixteenth section of the charter. This provides that if there shall be an insurance in this company, and also in any other company, the insurance in this company shall be void, unless such double insurance subsist with the consent of the directors, signified by indorsement on the back of the policy, signed by the president and secretary. Much stress is laid upon this section, and it is argued that inasmuch as such indorsement was not made, no action can be maintained on the note. It is very clear that if the only question in the case be whether an indorsement be necessary in general, our decision must be for the defendant. But it is a matter deserving serious inquiry, whether the case can be determined by the provisions of the sixteenth section alone.

There is no doubt that a policy of insurance may be made out complete, in all its forms, and upon its face taking effect from the date therein mentioned, but with an understanding that it should not become operative and binding upon either party until the happening of some certain event. For instance, a policy might be executed in proper form and delivered to the insured, together with the form of a note, to be executed by him and a surety. If, however, it should be proved that the policy was delivered with the agreement that it should not take effect until the execution and delivery of the note, the company would not be liable, if a loss should happen before that time. If we reverse the position of the parties, and suppose a case where a note is

delivered to the company, with the agreement that the maker should not be holden until the policy should be delivered to him, he would not be liable for assessments upon the note until he should receive the policy. These considerations are adverted to because they have a bearing upon the case before us.

It is not necessary, in this case, to define the powers of the agent of an insurance company, and ascertain how far he may bind his principal, and we do not propose to go any further than to ascertain what was the contract between the defendant and the agent of the company. When the defendant informed the agent that he was already insured in the New Hampshire Mutual Insurance Company, and that he did not wish to be without an insurance, the agent answered " that it was the custom of the plaintiffs for the applicant to keep his old policy until the new one was received, and the defendant might do so, and he would " fix it so that it would be all right and safe for him." This tends to show not a contract precisely, but the understanding of the parties that the new policy was not to take effect from its date, but only from the time of its reception by the defendant.

The letters which passed between the parties tend very strongly to show, not that the present policy was void on account of the double insurance, but that it was not to take effect till the other policy was surrendered. In Mr. Goodall's letter of March 5th, he wrote the company that he told their agent that he was insured in the New Hampshire Mutual; that he wished to surrender his policies there, and take out a policy with the plaintiffs; that the agent took the applications, and agreed to inform the plaintiffs and have it made all right. He then adds, " and he told me I might surrender them after I got yours." He then alludes to the sixteenth section, and desires to have an indorsement made on the back of the policy. In answer to this, Mr. Folsom, the secretary, in his letter of March 7th, says that Mr. Goodall misapprehends the import of the sixteenth section. He

says, "if you wish the insurance to remain in the New Hampshire Mutual Insurance Company, notwithstanding your insurance in our company, then it would be proper for the indorsement to be made agreeably to the charter. But if you have no insurance in the New Hampshire Insurance Company, there is not the least necessity for the indorsement. I presume you have surrendered your policies. If that is the case, you may rest assured that your policies, Nos. 1022, 562 and 564, are good as they are, and that no indorsement is necessary."

This tends to show the understanding of the parties that, upon the surrender of the policy in the New Hampshire Mutual, the present policy would become effective.

Mr. Folsom also says, in his letter to Mr. Goodall of May 15th, " I understood by Mr. Gale, our agent, and by your letter of the 5th of March, 1849, that your policies were to be given up in the New Hampshire Mutual, when you received policies from our office. If such is the fact, why should you wish an indorsement, permitting double insurance to subsist where none did subsist, as you would be discharged from the New Hampshire Mutual, when your insurance took effect in our company." He also states that they had received applications for insurance, " to be discharged from other offices when they took effect in ours," and says, " you can go into any other office and hold on to our policies until you receive policies from another office, and then request your policies in our office, to be discharged at the time when they take effect elsewhere."

This letter also seems to proceed upon the understanding before mentioned.

In Mr. Goodall's letter to Mr. Dearborn, the treasurer, dated on the 17th of December, he says, " I have written you before that Gale, as your agent, came, and I told him the property was insured in the New Hampshire and in the New England Mutual Insurance Companies, and was told by him to keep those on until I received your policies,

he would see it was all made right with you.  After I got
your policies I found they were void, by the sixteenth sec-
tion of your charter, unless you signed your consent on the
back of your policy to the former ones subsisting, &c.  I
then retained them to be surrendered, unless you would
make them good by signing your consent.  This you re-
fused."　It is evident from his letter, that Mr. Goodall
supposed that his rights were to be determined by the six-
teenth section of the charter, and that the agreement be-
tween himself and Mr. Gale was of no effect.  Mr. Dear-
born, in his letter of December 19th, says that the sixteenth
section was designed to apply to cases where insurances were
to subsist in his own and also in some other company, and
was not intended to apply to any case where no insurance
was to be effected except by his company.  He also writes
as follows : " I have examined the former correspondence
between yourself and the secretary of this company, and I
find that when you made application to be insured at this
office, you had insurance on the same property in the Con-
cord companies, and that it was your intention at the time
to give up your policies in the Concord offices when our
policies should take effect in this office.  This was the un-
derstanding that Mr. Gale, the individual who made out
your application, had relative to this subject ; and the sec-
retary and directors of this office supposed when they issued
your policies, that the policies covering the same property
which you held from the Concord companies, were to be dis-
charged, and that only one insurance was to subsist on your
property, and that in this office.  This being the fact, section
sixteenth of our charter did not *invalidate* your policies, nor
was any action on the part of the officers of this company
necessary for your security."

　　The case finds that the defendant surrendered his policy
in the New Hampshire Mutual, on the 1st of February,
1849, after receiving the policy now in dispute.  This ac-
is brought to recover an assessment of $18 upon the

note made on the 4th of February, 1850. It appears, then, that not only was it stated and understood, by both parties, that upon the receipt of the present policy, the policy in the New Hampshire Mutual was to be surrendered, but that the defendant carried that agreement into effect. No question, therefore, arises under the sixteenth section of the charter. The evidence tends clearly to show that neither party ever contemplated a double insurance. The plaintiffs did not, for they so stated explicitly. The defendant did not, and he was satisfied with the matter as it was, until his attention was turned to the sixteenth section, and then he feared that that section was so imperative in its terms as to control the agreement made between himself and Mr. Gale, the agent. If an action had been brought against the company to recover for a loss happening after the defendant received the policy, it is very clear that upon this evidence they could not have set up the defence of a double insurance. It is the ordinary case of an instrument, complete in its form, but by the agreement of the parties not to take effect until a certain event happens. The parties do not differ in their understanding of the agreement between Gale and the defendant, and all the evidence goes to prove it.

The only question for the court now is, whether we should render judgment upon the verdict, upon the ground that the policy was valid, because of the agreement between the parties, or whether we shall set it aside for the purpose of enabling the parties to lay the evidence of the agreement before the jury. In the latter case, the question for the jury will be whether it was the understanding that the present policy was not to take effect until the surrender of the policy in the New Hampshire Mutual. The defendant can, if he desire, have an opportunity to apply to the judge who tried the cause for an amendment of the case; or if he has misapprehended the true question at issue, he may, upon proper

evidence, move that this case be discharged. But as the matter now stands, there must be

*Judgment on the verdict.*